**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JEANINE M. CERRONE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 10-114 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Judge Nora Barry Fischer |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

Jeanine Marie Cerrone ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f ("Act"). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Nos. 9, 13). The record has been developed at the administrative level. (Docket Nos. 6 - 6-8). For the following reasons, Defendant's Motion for Summary Judgment is DENIED, Plaintiff's Motion for Summary Judgment is DENIED to the extent it seeks to award benefits, and GRANTED to the extent it seeks a remand for further administrative proceedings, the decision of the Administrative Law Judge, William E. Kenworthy, ("ALJ") is vacated, and the case REMANDED for further consideration.

1

## II. PROCEDURAL HISTORY

Plaintiff submitted applications for SSI and DIB on July 25, 2007. (R. at 98-112)[1]. She alleged entitlement to disability benefits as a result of bipolar disorder, depression, and epilepsy. (R. at 117). Plaintiff's claims for DIB and SSI were initially denied by the Social Security Administration on October 17, 2007. (R. at 69). She requested a hearing, which was held on April 9, 2009. (R. at 21). Her claims were denied in a decision dated April 20, 2009. (R. at 8). The Administrative Appeals Council denied Plaintiff's request for review on December 4, 2009, making the decision of the ALJ the final decision of the Commissioner. (R. at 1). Plaintiff brought the instant action in this Court by filing her Complaint on August 10, 2009. (Docket No. 1). Defendant filed his Answer on March 23, 2010. (Docket No. 10). Cross-motions for Summary Judgment followed. (Docket Nos. 13, 17).

## III. STATEMENT OF FACTS

### A. General Background

Plaintiff's birthday is April 9, 1972, and at the time of application for SSI and DIB, she was 35 years of age. (R. at 98, 105). Plaintiff completed high school and two years of undergraduate study at Robert Morris College. (R. at 386). She claimed that her disability onset date was October 15, 2005, and further claimed that she was no longer able to work due to her disability on December 1, 2006. (R. at 98, 105). At the time of application, Plaintiff stated that she was married to John Robert Cerrone, and they had no children. (R. at 98, 106). Plaintiff lived in an institution known as "The Lighthouse," at 1633 Weirich Avenue, Washington, Pennsylvania 15301, where she claimed

---

[1]

Citations to Docket Nos. 6 - 6-8, the Record, *hereinafter*, "R. at ___."

to be receiving treatment for bipolar disorder, alcoholism, and drug addiction. (R. at 99, 106, 147).

Plaintiff expected to remain at the facility for three to six months. (R. at 147). At the time of the

hearing with the ALJ, Plaintiff had divorced her husband, and was living with her boyfriend at 108

Pennsylvania Avenue, Pittsburgh, Pennsylvania 15202. (R. at 46, 147).

Over a period spanning 1991 to 2006, Plaintiff worked for approximately ten different

employers. (R. at 118). Her jobs did not normally exceed several months to a year in duration. (R.

at 118). Plaintiff's longest period of employment was 1999 through 2005, during which time she

worked as a clerk at a local hospital. (R. at 118). As a clerk, Plaintiff worked eight hours a day, five

days a week. (R. at 132-33). Plaintiff described her duties as including answering phones, dealing

with other hospitals and doctors, copying medical records, and pulling and filing charts. (R. at 132-

33).

### B. Medical Background - Physical

Janette Partezana, M.D., Plaintiff's primary care physician, referred Plaintiff to neurologist

George A. Small, M.D., at Allegheny General Hospital, for potential neurological issues. (R. at 120,

174). In a letter to Dr. Partezana following Plaintiff's first visit, dated October 18, 2001, Dr. Small

opined that Plaintiff was likely suffering from generalized seizure disorder - particularly, petit mal

epilepsy with generalization.[2] (R. at 174). Dr. Small noted that an EMG[3] was performed and the results were unremarkable. (R. at 174). An MRI[4] of Plaintiff's spine revealed mild spondylosis. (R. at 174). An EEG[5] showed evidence of petit mal epilepsy with eyelid fluttering and 3 per second wave discharges. (R. at 174). Dr. Small prescribed Depakote[6] for the epilepsy and Advil for back pain. (R. at 174). Dr. Small also recommended that Plaintiff refrain from driving until further testing was completed. (R. at 174).

Plaintiff continued to see Dr. Small through 2004. In a letter to Dr. Partezana dated October 21, 2004, Dr. Small explained that Plaintiff had missed numerous appointments, and recently had neglected to take two doses of Depakote, resulting in a "generalized fit" with significant head injury.

---

[2]

"A petit mal seizure is the term commonly given to a staring spell, most commonly called an 'absence seizure.' It is a brief (usually less than 15 seconds) disturbance of brain function due to abnormal electrical activity in the brain. Petit mal seizures occur most commonly in people under age 20, usually in children ages 6 to 12. They can occur as the only type of seizure but can also happen along with other types of seizures such as generalized tonic-clonic seizures (also called grand mal seizures), twitches or jerks (myoclonus), or sudden loss of muscle strength (atonic seizures)." MedlinePlus, U.S. National Library of Medicine/ National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/000696.htm (last visited June 28, 2010).

[3]

"An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction." WebMD, http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies (last visited June 28, 2010).

[4]

"Magnetic resonance imaging (MRI) is a test that uses a magnetic field and pulses of radio wave energy to make pictures of organs and structures inside the body." WebMD, http://www.webmd.com/a-to-z-guides/magnetic-resonance-imaging-mri (last visited June 28, 2010).

[5]

"An electroencephalogram (EEG) is a test that measures and records the electrical activity of your brain." WebMD, http://www.webmd.com/epilepsy/electroencephalogram-eeg-21508 (last visited June 28, 2010).

[6]

Depakote, also known as "Divalproex Sodium Enteric," is "used to treat seizure disorders, certain psychiatric conditions (manic phase of bipolar disorder), and to prevent migraine headaches." WebMD, http://www.webmd.com/drugs/drug-1788-Depakote+Oral.aspx?drugid=1788&drugname=Depakote+Oral&source=2 (last visited June 28, 2010).

(R. at 173). After she was seen in the emergency room, a CT[7] scan of Plaintiff's head was performed with no abnormal results. (R. at 173). Dr. Small noted that the levels of Depakote in Plaintiff's bloodstream were low. (R. at 173). Dr. Small believed that if Plaintiff were totally compliant with her medical regimen, she would have no problems with seizures, and would be able to drive. (R. at 173).

### C. Medical Background - Psychological

#### 1. Clinical Treatment

Plaintiff sought psychiatric treatment for depression, anxiety, and stress at the Staunton Clinic, in McKees Rocks, Pennsylvania, from 2001 until 2009. (R. at 120, 262, 434-35). During her treatment at the Staunton Clinic, Plaintiff was seen by Phillip Mondoly, M.D., a psychiatrist, and by Jim Gigliotti, L.P.C., an adult psychotherapist. (R. at 120, 435). Plaintiff's first recorded visit with Dr. Mondoly was January 23, 2002, and last recorded visit was August 12, 2008 - though there was a large span of time between the last two appointments: November 27, 2006 and August 12, 2008. (R. at 262, 271, 419-22). Dr. Mondoly diagnosed Plaintiff with dysthymic disorder,[8] major

---

[7]

"A computed tomography (CT) scan uses x-rays to make detailed pictures of structures inside of the body." WebMD, http://www.webmd.com/a-to-z-guides/computed-tomography-ct-scan-of-the-body (last visited June 28, 2010).

[8]

Dysthymic disorder, also known as, "Dysthymia," is a "mild but chronic form of depression. Dysthymia symptoms usually last for at least two years, and often much longer than that." MayoClinic.com, http://www.mayo clinic.com/health/dysthymia/ds01111 (last visited June 28, 2010).

depression,[9] and bipolar disorder[10] over the course of his treatment of Plaintiff. (R. at 261-72). Plaintiff's initial Global Assessment of Functioning[11] ("GAF") score was 56 on January 23, 2002. (R. at 262). By October 2, 2002, Plaintiff's GAF score was at 60, and until her last appointment with Dr. Mondoly, Plaintiff never received a GAF score other than 60. (R. at 261-72). At her final session with Dr. Mondoly, Plaintiff received a GAF score of 58. (R. at 419). Plaintiff was prescribed

---

[9]

Major Depression "affects how you feel, think and behave. Depression can lead to a variety of emotional and physical problems. You may have trouble doing normal day-to-day activities, and depression may make you feel as if life isn't worth living." MayoClinic.com, http://www.mayoclinic.com/health/depression/DS00175 (last visited June 28, 2010).

[10]

Bipolar disorder, also known as, "manic-depressive disorder," "causes mood swings that range from . . . the lows of depression to the highs of mania. When you become depressed, you may feel sad or hopeless and lose interest or pleasure in most activities. When your mood shifts in the other direction, you may feel euphoric and full of energy." MayoClinic.com, http://www.mayoclinic.com/health/bipolar-disorder/DS00356 (last visited June 28, 2010).

[11]

The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." A GAF score of between 31-40 denotes "severe symptoms" with some impairment in reality testing or major impairments in several areas. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication." *Id.*

Prozac,[12] Xanax,[13] Effexor,[14] Abilify,[15] Cogentin,[16] Ambien,[17] and Trazodone[18] during the course of

her treatment, and Dr. Mondoly consistently noted Plaintiff's stability on her prescribed maintenance

medications. (R. at 261-272, 419). Dr. Mondoly also consistently noted that Plaintiff was alert and

oriented times three, pleasant, cooperative, calm, and goal-oriented. (R. at 261-272). Plaintiff

typically reported doing well and remaining active despite work and family-related stress. (R. at 261-

272). However, Dr. Mondoly found that Plaintiff suffered from intermittent difficulty with sleep,

[12]

Prozac, also known as, "Flouxetine," is "used to treat a variety of conditions including depression and other mental/mood disorders. These medications can help prevent suicidal thoughts/attempts and provide other important benefits." WebMD, http://www.webmd.com/drugs/drug-6997-Prozac+Oral.aspx (last visited June 28, 2010).

[13]

Xanax, also known as, "Alprazolam," is "used to treat anxiety and panic disorders. It belongs to a class of medications called benzodiazepines which act on the brain and nerves . . . to produce a calming effect." WebMD, http://www.webmd.com/drugs/drug-9824-Xanax+Oral.aspx?drugid=9824&drugname=Xanax+Oral&source=1 (last visited June 28, 2010).

[14]

Effexor, also known as, "Venlafaxine," is used to "treat a variety of conditions, including depression and other mental/mood disorders. These medications can help prevent suicidal thoughts/ attempts and provide other benefits." WebMD, http://www.webmd.com/drugs/drug-1836-Effexor+Oral.aspx?drugid=1836&drugname= Effexor+Oral&source=1 (last visited June 28, 2010).

[15]

Abilify, also known as, "Aripiprazole," is "used to treat certain mental/mood disorders (such as bipolar disorder, schizophrenia). It may also be used in combination with other medication to treat depression." WebMD, http://www.webmd.com/drugs/drug-64439-Abilify+Oral.aspx?drugid=64439&drugname=Abilify+Oral&source=1 (last visited June 28, 2010).

[16]

Cogentin, also known as, "Benztropine," is "used to treat symptoms of Parkinson's disease or involuntary movements due to the side effects of certain psychiatric drugs." WebMD, http://www.webmd.com/drugs/drug-13533-Cogentin+Oral.aspx?drugid=13533&drugname=Cogentin+Oral&source=1 (last visited June 28, 2010).

[17]

Ambien, also known as, "Zolpidem," is "used to treat sleep problems. It may help you fall asleep faster, stay asleep longer, and reduce the number of times you awaken during the night." WebMD, http://www.webmd.com/drugs/drug-9690-Ambien+Oral.aspx?drugid=9690&drugname=Ambien+Oral&source=1 (last visited June 28, 2010).

[18]

Trazodone is "used to treat depression. This drug is used to help people with trouble sleeping to fall asleep. It is also used to help people with anxiety to relax." WebMD, http://www.webmd.com/drugs/drug-11188-Trazodone+Oral.aspx?drugid=11188&drugname=Trazodone+Oral&source=1 (last visited June 28, 2010).

and had issues with her weight, stress, and emotional stability. (R. at 261-272). After Plaintiff attempted suicide and was subsequently admitted to the UPMC Western Psychiatric Institute and Clinic, Dr. Mondoly also noted that Plaintiff was abusing crack cocaine. (R. at 270).

In his final session with Plaintiff on August 12, 2008, Dr. Mondoly completed a Mental Residual Functional Capacity Questionnaire. (R. at 419-22, 430-33). The RFC assessment indicated Plaintiff suffered from a pattern of depressive episodes, mood vacillations, and impulsivity, and that treatment had resulted in only some mood stability. (R. at 419-22). Plaintiff's symptoms included anhedonia,[19] thoughts of suicide, feelings of guilt or worthlessness, difficulty in thinking or concentrating, psychomotor agitation or retardation, persistent disturbances of mood or affect, emotional withdrawal or isolation, epilepsy, bipolar syndrome, hyperactivity, emotional lability, flight of ideas, maladaptive patterns of behavior, easy distractibility, sleep disturbance, and involvement in activities with a high probability of unrecognized, painful consequences. (R. at 420). Dr. Mondoly found that Plaintiff was unable to meet competitive standards or seriously limited in all categories under (1) Mental Abilities and Aptitudes Needed to do Unskilled Work, (2) Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work, and (3) Mental Ability Needed to Do Particular Types of Jobs, with the exception of the ability to adhere to basic standards of neatness and cleanliness, ability to travel in unfamiliar places, and ability to use public transportation. (R. at 421-22). Dr. Mondoly indicated that Plaintiff would miss more than four days of work per month. (R. at 422). Dr. Mondoly did not find that Plaintiff's limitations included substance abuse. (R. at 422).

---

[19]

Anhedonia is defined as the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." WebMD, http://dictionary.webmd.com/terms/anhedonia (last visited July 6, 2010).

Plaintiff's first recorded therapy session with Mr. Gigliotti was March 29, 2006, and her last recorded session was March 9, 2009 - though there was a large gap in therapy sessions between November 27, 2006, and August 7, 2008. (R. at 273-279, 424-33). Plaintiff was assessed an initial GAF score of 60, which decreased to 53 on November 27, 2006. (R. at 273-279). Mr. Gigliotti typically found Plaintiff's psychological state to be unremarkable, though occasionally noting remarkable mood, affect, and speech, and once indicating Plaintiff showed compromised insight and impulsivity. (R. at 273-279, 424-33). With few exceptions, Mr. Gigliotti consistently indicated that Plaintiff was not abusing drugs or was in active recovery. (R. at 273-279). Following a relapse on November 8, 2006, Mr. Gigliotti recorded that Plaintiff's life had become characterized by drug abuse, poor decision making, anxiety, relationship stress, and unstable employment. (R. at 277). In subsequent meetings, Mr. Gigliotti's reports returned to the usual tone. (R. at 273-279, 424-33). In her six therapy sessions between August 7, 2008 and March 9, 2009, Plaintiff's GAF scores fluctuated between 57 and 64. (R. at 424-33).

However, following a March 9, 2009 therapy session, Mr. Gigliotti completed a Mental Functional Capacity Questionnaire showing a recent suicide attempt by Plaintiff, as well as more severe mood vacillations, despair, and anxiety. (R. at 430). Specifically, Mr. Gigliotti found that Plaintiff suffered from decreased energy, impairment in impulse control, persistent anxiety, mood disturbance, difficulty thinking or concentrating, psychomotor agitation or retardation, disturbance of affect, change in personality, bipolar syndrome, intense and unstable personal relationships, hyperactivity, emotional lability, flight of ideas, maladaptive patterns of behavior, illogical thinking, pressures of speech, sleep disturbance, and involvement in activities that have a high probability of unrecognized, painful consequences. (R. at 431). Mr. Gigliotti determined that Plaintiff was

seriously limited, unable to meet competitive standards, or without useful ability to function in all categories under (1) Mental Abilities and Aptitudes Needed to do Unskilled Work, (2) Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work, and (3) Mental Ability Needed to Do Particular Types of Jobs. (R. at 432-33). He further opined that Plaintiff was likely to miss four or more days of work per month. (R. at 433). Substance abuse was not considered to contribute to any of Plaintiff's limitations. (R. at 433).

Mr. Gigliotti and Dr. Mondoly jointly submitted a letter on March 16, 2009, in support of Plaintiff's claim for DIB and SSI benefits. (R. at 434-35). The letter stated that Plaintiff had been receiving treatment at Staunton Clinic since October 3, 2001, and indicated that Plaintiff was diagnosed with bipolar disorder, polysubstance abuse, and personality disorder[20]. (R. at 434). Both Mr. Gigliotti and Dr. Mondoly found that Plaintiff was extremely unlikely to maintain competitive employment due to the persistent nature of her bipolar symptoms and her pathogenic patterns of engaging in unhealthy relationships. (R. at 435). They believed that Plaintiff concealed her distress with an affable demeanor, and was quite adept at misleading others into believing she was happy. (R. at 435). They concluded that Plaintiff's inability to adequately cope with work stress, her impulsivity, mood vacillations, pervasive despair, irregular life rhythms, self-destructive behavior, and poor decision making precluded her from gainful employment. (R. at 434-35).

---

[20]

"Personality disorder is a general term for a type of mental illness in which your ways of thinking, perceiving situations and relating to others are dysfunctional. There are many specific types of personality disorders. In general, having a personality disorder means you have a rigid and potentially self-destructive or self-denigrating pattern of thinking and behaving no matter what the situation. This leads to distress in your life or impairment of your ability to go about routine functions at work, school or social situations. In some cases, you may not realize that you have a personality disorder because your way of thinking and behaving seems natural to you, and you may blame others for your circumstances." MayoClinic.com, http://www.mayoclinic.com/health/personality-disorders/DS00562 (last visited June 28, 2010).

## 2. Hospital and Out-Patient Treatment

On May 31, 2005, Plaintiff was admitted to the UPMC Western Psychiatric Institute and Clinic after being transferred from the UPMC Presbyterian Hospital following an attempted polypharmacy overdose. (R. at 249). In the Discharge Summary Report of Western Psychiatric, clinician James W. Stein, M.S.N., and physician Robert S. Dealy, M.D. noted Plaintiff's history of treatment for psychological disorders and suicide attempts. (R. at 249, 255). Following a confrontation with her husband, Plaintiff allegedly attempted to overdose using a variety of drugs over a period of several days. (R. at 249). Having awakened without being discovered after two overdose attempts, Plaintiff made a third attempt and was discovered unconscious by her grandmother. (R. at 249).

At discharge on June 7, 2005, Plaintiff showed moderate improvement, was advised to engage in individual, group, and family therapy, and was counseled to continue taking prescription antidepressants. (R. at 250). Plaintiff also showed good attention to personal hygiene, and no abnormal behavior. (R. at 251). She was euthymic[21] and without abnormality in speech or thought, and was without perceptual distortion. (R. at 251). Plaintiff was alert and oriented in three spheres, and had reasonably good insight as to her condition. (R. at 251). Plaintiff was diagnosed as having a depressive disorder, and was given a GAF score of 39. (R. at 252-53). The discharge report stated that Plaintiff was prescribed Effexor and Xanax. (R. at 249).

Plaintiff was next admitted to Genesis House Recovery in Lakeworth, Florida, for substance abuse treatment on January 8, 2007. (R. at 282-83). Plaintiff completed the program on March 12,

---

[21]

Euthymia refers to periods of normal mood - without mood elevation, mania, or depression. ABCNews/Health, http://abcnews.go.com/Health/BipolarOverview/story?id=4359995 (last visited July 6, 2010).

2007. (R. at 299). There she received treatment and counseling for cocaine and alcohol abuse, depression, sexual abuse issues, self-esteem issues, and long-term aftercare. (R. at 309). Plaintiff successfully completed 67 days of treatment. (R. at 330). It was recommended that Plaintiff pursue out-patient care two times a week at Mercy Behavioral Health in Pittsburgh, seek a sponsor and group home, and avoid all exposure to addictive substances. (R. at 330). Once in Pennsylvania, Plaintiff was admitted to Greenbriar Treatment Center in Washington, Pennsylvania, for in-patient treatment on June 28, 2007, and completed its program July 16, 2007. (R. at 383). Plaintiff then proceeded to live in a halfway house sponsored by Greenbriar on July 16, 2007, but was administratively discharged from the program on September 13, 2007. (R. at 383).

### 3. Consultative Examinations

On October 1, 2007, Michael Crabtree, Ph.D., completed a consultative examination of Plaintiff for the purpose of completing an RFC assessment. (R. at 384). Dr. Crabtree noted initially that Plaintiff felt her drug abuse interfered with her cognitive functioning and created an impediment to her returning to gainful employment. (R. at 384). At the consultation with Dr. Crabtree, Plaintiff claimed to have been sober since June of 2007. (R. at 385). Plaintiff further explained that abuse of crack cocaine in December of 2006 most negatively impacted her life, though she had been recreationally using cocaine and alcohol for many years prior. (R. at 385). Plaintiff also stated that her current medication regimen of Depakote, Effexor, Abilify, Cogentin, and Trazodone allowed her to function, and she refused to go without her medications because of how much worse she would feel. (R. at 385).

Dr. Crabtree determined that Plaintiff's behavior and psychomotor activity were normal, and her speech clear and easily understood. (R. at 386). Plaintiff's stream of thought had continuity

12

and productivity. (R. at 387). Dr. Crabtree felt Plaintiff exhibited average intelligence, showed no signs of delusional thinking, was well-oriented, and was able to think in the abstract. (R. at 387-88). Plaintiff was found to have no difficulty with impulse control or drug abuse at the time of the consultation, her judgment was sound, and her interpersonal skills and understanding of social conventions was strong. (R. at 389). Dr. Crabtree indicated that Plaintiff was capable of cooking, cleaning, shopping, maintaining a residence, paying bills, and caring for herself. (R. at 390). Overall, Plaintiff had good insight into her condition. (R. at 389).

However, Dr. Crabtree indicated that Plaintiff exhibited depressive symptoms - guilt, worthlessness, fatigue, passive thoughts of death, and hypomania. (R. at 386-87). He also noted Plaintiff's history of suicide attempts. (R. at 386) Dr. Crabtree observed some psychomotor retardation - Plaintiff would unconsciously sit and stare for long periods of time. (R. at 386). Plaintiff also had notable difficulty concentrating, particularly where there were multiple tasks to be completed. (R. at 386, 388). Concentration, persistence, and pace, generally, were found to be "problematic" for Plaintiff. (R. at 390). Dr. Crabtree believed Plaintiff to be markedly limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; and (3) respond appropriately to work pressures in a usual work setting. (R. at 394). Plaintiff was moderately limited with respect to: (1) carrying out short, simple instructions; (2) interacting appropriately with the public; (3) interacting appropriately with co-workers; and (4) responding appropriately to changes in a routine work setting. (R. at 394). Plaintiff had slight limitations in her ability to understand and remember short, simple instructions, and had no limitation with respect to making judgments on simple, work-related decisions. (R. at 394). Dr. Crabtree indicated that substance abuse was not one of Plaintiff's impairments. (R. at 395).

On October 9, 2007, psychologist Edward Jonas, Ph.D., reviewed Plaintiff's medical records and completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique. (R. at 396-411). Dr. Jonas concluded that Plaintiff's determinable impairments were, in his opinion, bipolar disorder and polysubstance abuse reportedly in early remission. (R. at 398). He opined that Plaintiff was able to meet the basic demands of competitive work on a sustained basis despite the limitations stemming from her impairments. (R. at 398). Dr. Jonas found that Plaintiff was markedly limited in her ability to: (1) understand and remember detailed instructions; and (2) carry out detailed instructions. (R. at 396).

Dr. Jonas further determined that Plaintiff was moderately limited in her ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or proximity to others without being distracted by them; (5) make simple, work- related decisions; (6) complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (7) accept instructions and respond appropriately to criticism from supervisors; (8) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (9) respond to changes in work settings; and (10) set realistic goals or make plans independently of others. (R. at 396-97).

### D. Administrative Hearing

#### 1. Plaintiff's Testimony

An administrative hearing was held on April 9, 2009. (R. at 21). Plaintiff appeared and was

represented by Elizabeth Williams, Esquire. (R. at 45). A vocational expert, Mary Beth Kopar,[22] also appeared to testify. (R. at 45). When questioned about her employment, Plaintiff replied that she was last employed in 2007, when she worked part-time at a Giant Eagle grocery store. (R. at 46). She testified that Giant Eagle scheduled her for 48 hours a week, despite her part-time status. (R. at 46). Plaintiff worked as a clerk at the fish counter, but left after two or three months because she could not keep up with the hours for which she was scheduled and was asked to resign. (R. at 46). Plaintiff's employment at the Lincoln Bakery just prior to her employment with Giant Eagle also ended after only a few months, due to absences. (R. at 47). This was typical of Plaintiff's employment up until the time of the hearing - Plaintiff would take a position, interacting well with her co-workers, but would ultimately be terminated because of a failure to fulfill her duties adequately or to avoid excessive absences. (R. at 60).

The ALJ asked Plaintiff about her most consistent period of employment, from 2002 to 2005. (R. at 47). Plaintiff testified that during that time she was employed by Ohio Valley General Hospital first as a file clerk, then as a correspondence secretary. (R. at 47). Following her hospitalization in 2005, Plaintiff had difficulty keeping up with her workload, and was terminated as a result. (R. at 47). Prior to and after her hospitalization, Plaintiff admitted to abusing illegal drugs. (R. at 48). Plaintiff also stated that she began using crack cocaine in December of 2006, and considered that to be the point when her life became out of control. (R. at 48). She and her husband had difficulties at the time, and they subsequently divorced. (R. at 48).

With respect to her epilepsy, Plaintiff testified that she was able to control her seizures by

---

22

*See* discussion *infra* at p. 17.

taking Depakote, and had not experienced any seizures for approximately four years prior to the hearing. (R. at 49). In terms of psychological treatment, Plaintiff claimed that she attended therapy sessions with Mr. Gigliotti once a week, went to bipolar group therapy sessions conducted by Mr. Gigliotti every Monday, and was treated by Dr. Mondoly every three months. (R. at 49).

In response to questioning about her living arrangements, Plaintiff stated that she had been living with her boyfriend off and on for approximately two years, but that she also stayed with her father from time to time. (R. at 49-50). Plaintiff stated that she took care of the day-to-day maintenance of her boyfriend's house, did grocery shopping, made coffee in the morning, made lunches for her boyfriend, cooked dinner, and tried to do at least one chore a day. (R. at 50, 57). Plaintiff often felt sleepy during the day, but tried to help around the house, and stay awake when her boyfriend was home to avoid being yelled at for being lazy. (R. at 50, 56). Plaintiff said that, otherwise, she just hibernated at her home. (R. at 53). With the exception of briefly waking in the morning before her boyfriend left for work, Plaintiff claimed that she was only awake most days from about 2:00 p.m. until 8:00 p.m. (R. at 57).

Plaintiff stated that she no longer socialized with her friends because of their involvement with drugs, but that she remained close to her family and maintained relatively frequent contact with her father and siblings. (R. at 50). During the day, Plaintiff testified that she often went to the home of her boyfriend's elderly cousin to play cards and get out of the house. (R. at 51). She mentioned that she used to enjoy reading, but found it difficult to finish a book due to her inability to maintain interest and concentration. (R. at 51). The same held true for her crocheting hobby. (R. at 57). Typically, Plaintiff just watched movies. (R. at 58). Plaintiff mentioned going to a casino with some family, once. (R. at 388).

Plaintiff claimed that her psychiatric medications made her sleepy, but that she had difficulty sleeping for more than 2 hours at a time. (R. at 52). Yet, she also claimed that she was usually able to fall back asleep. (R. at 52). She explained that the medications prescribed to help her sleep had no effect for her. (R. at 52).

Plaintiff testified that she had spent time in a halfway house for two to three months to receive continued drug-related treatment after leaving Genesis House, and to avoid returning immediately to an unstructured home environment. (R. at 54-55). Plaintiff claimed that she was successful in the structured environment of the halfway house and formed close bonds with the other residents. (R. at 55). However, Plaintiff had not attended AA or NA meetings regularly for a least a year prior to the hearing. (R. at 53).

Plaintiff testified that while living with her boyfriend around Christmas of 2008, she and he were in a heated argument, and Plaintiff again attempted to overdose on prescription drugs. (R. at 55). Plaintiff then left the house for the weekend without informing her boyfriend. (R. at 56). As a result of the attempted overdose, Plaintiff allegedly became ill for two weeks, but did not seek medical help. (R. at 56) Plaintiff also did not tell her therapists about the suicide attempt until some time after the two weeks of her illness. (R. at 56). At the hearing, Plaintiff acknowledged her earlier suicide attempt, after which she admitted herself to the Western Psychiatric Institute and Clinic. (R. at 56). Plaintiff, however, testified that she was getting stronger and gaining self-esteem. (R. at 58).

## 2. Vocational Expert's Testimony

Mary Beth Kopar[23] testified as a vocational expert at the hearing. The ALJ asked Ms. Kopar

---

[23]

Plaintiff had no objection to the vocational expert's qualifications. (R. at 60). Ms. Kopar received her Masters of Education in Rehabilitation Counseling and her Bachelor of Science in Psychology from the University of Pittsburgh. (R. at 92). At the time of the hearing, she was a Vocational Case Manager and Supervisor with Alternative Careers &

to state whether employment would be available to an individual of the same age, education, and work experience as Plaintiff, and who was: (1) only capable of performing work at the light exertional level; (2) unable to tolerate exposure to heights or hazardous machinery; (3) limited to the performance of simple repetitive tasks not requiring sustained attention and concentration upon detailed or complex matters; and (4) unable to perform work involving rapid production pace or similar sources of a high level of work stress. (R. at 61-62).

Ms. Kopar testified that Plaintiff could perform one of 400,000 sorter positions in the national economy, 400,000 laundry folder positions in the national economy, and 1,000,000 cleaner positions in the national economy. (R. at 62). In response, Plaintiff's attorney referred to the mental RFC assessment by Mr. Gigliotti, (R. at 430-433), and asked Ms. Kopar if a hypothetical individual with the limitations marked therein could maintain competitive employment.[24] (R. at 64). Ms. Kopar replied that such an individual could not maintain competitive employment. (R. at 62).

### E. Decision of the ALJ

The ALJ found that Plaintiff was not disabled under the Act beginning December 1, 2006, through the date of the decision. (R. at 11). Specifically, the ALJ determined that:

(1)     The [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2011;
(2)     The [Plaintiff] has not engaged in substantial gainful activity since December 1, 2006, the alleged onset date;
(3)     The [Plaintiff] has the following severe impairments: A bipolar disorder and

---

Transitions, Inc. of Pittsburgh. (R. at 92). Ms. Kopar is a Certified Rehabilitation Counselor, Qualified Rehabilitation Professional, and Vocational Expert. (R. at 94).

[24]

Mr. Gigliotti reported serious limitation, inability to meet competitive standards, and/ or lack of useful ability to function, in all categories under (1) Mental Abilities and Aptitudes Needed to do Unskilled Work, (2) Mental Abilities and Aptitudes Needed to Do Semiskilled and Skilled Work, and (3) Mental Abilities and Aptitude Needed to do Particular Types of Jobs. (R. at 432-33).

drug addiction in short-term remission;

(4)　The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(5)　After careful consideration of the entire record . . . the [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the [Plaintiff] is limited to the performance of simple, repetitive tasks that would not require sustained attention and concentration upon detailed or complex natters. She should avoid work requiring a rapid production rate pace or similar sources of high level work related stress.  She should also avoid exposure to heights or to hazardous machinery;

(6)　The [Plaintiff] is unable to perform any past relevant work;

(7)　The [Plaintiff] was born on April 9, 1972 and was 34 years old, which is defined as a younger individual age 18-44, on alleged disability onset date;

(8)　The [Plaintiff] has at least a high school education and is able to communicate in English;

(9)　Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Plaintiff] is "not disabled," whether or not the [Plaintiff] has transferable job skills;

(10)　Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform; and

(11)　The [Plaintiff] has not been under a disability, as defined in the Social Security Act, from December 1, 2006 through the date of this decision.

(R. at 13-19).  Accordingly, the ALJ found that Plaintiff was not entitled to benefits under the Act.

(R. at 20).

## IV. LEGAL STANDARD

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[25] and 1383(c)(3).[26] Section 405(g) permits a district court to review

---

[25]

Section 405(g) provides in pertinent part:

　　Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his

transcripts and records upon which a determination of the Commissioner is based. Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding DIB), and judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f, regarding SSI), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a). *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3(1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d Cir. 2002).

When reviewing a decision denying DIB and SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns,* 312 F.3d at 118. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the

---

principal place of business

42 U.S.C. § 405(g).

[26]
Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## V. DISCUSSION

In her Motion for Summary Judgment, Plaintiff attacks the ALJ's determination as to her mental health limitations, only, and not as to her physical limitations. (Docket No. 9). Plaintiff argues that her case should be remanded because the ALJ failed to conduct a proper "function-by-function" assessment of Plaintiff's mental RFC, the ALJ improperly disregarded the findings of Dr. Mondoly and Mr. Gigliotti, and the ALJ did not incorporate all of the limitations found by Dr. Crabtree, despite giving his findings substantial weight. (Docket No. 9 at 2). Defendant counters by arguing that Plaintiff's mental status findings by Mr. Gigliotti and Dr. Crabtree showed essentially no psychological deficits; Mr. Gigliotti's GAF assessments indicated only mild psychological symptoms; Plaintiff was successfully controlled on prescription medications despite erratic therapeutic treatments; Dr. Crabtree and Dr. Jonas' RFC findings indicated only mild psychological limitations; and Plaintiff's schedule of daily activities indicated relatively normal levels of functioning. (Docket No. 13 at 8-10). Thus, Defendant maintains that the ALJ's decision is supported by substantial evidence. The Court now turns to the parties' arguments.

### A. Legal Standard - RFC Assessment & Treating Physician

Generally, "'residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations. *See Cooper v. Barnhart*, Civ. A. No. 06-2370, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)). In determining a claimant's RFC, an administrative law judge must consider all evidence of record and the claimant's subjective

complaints and statements concerning his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a), and 416.920.

Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. *Burnett*, 220 F.3d at 121. As the Court of Appeals held in *Burnett*, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* (quoting *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981)). The review of the evidence of record need not be exhaustive, but should "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Fargnoli v. Massanari*, 347 F.3d 34, 41 (3d Cir. 2001); *Cotter*, 642 F.2d at 704-05. However, the determination of disabled status for purposes of receiving SSI - a decision reserved for the Commissioner, only - will not be affected by a medical source simply because it states that a claimant is "disabled," or "unable to work." 20 C.F.R. § 416.927(e).

In the Third Circuit, a treating physician's opinions may be entitled to great weight - considered conclusive unless directly contradicted by evidence in a claimant's medical record - particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

While it is not expected that the ALJ's explanation match the rigor of "medical or scientific

analysis" a scientist might provide in justifying his or her decisions, it is expected that when rejecting a treating physician's findings or according such findings less weight, the ALJ will be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Moreover, the ALJ "should not substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

### B. Sufficiency of ALJ's RFC Assessment

The ALJ determined that Plaintiff had the capacity to perform a full range of work with the following exceptions: Plaintiff would be limited to the performance of simple, repetitive tasks that would not require sustained attention and concentration upon detailed or complex matters; Plaintiff could not work in an environment with a rapid production rate, pace, or similar source of a high level of work-related stress; and, Plaintiff would need to avoid exposure to heights or hazardous machinery. (R. at 16). Plaintiff argues that the ALJ erred in making this determination because he failed to discuss all of Plaintiff's pertinent, identified limitations.[27] (Docket No. 9 at 2). Defendant

---

[27] Plaintiff argues in her Motion for Summary Judgment that the method the ALJ used when formulating his RFC assessment of her was improper, in part, because it failed to include, individually, each limitation listed for consideration on the mental RFC form by the Program Operations Manual System ("POMS"). (Docket No. 9 at 8) (citing POMS DI 24510.090, 25020.010; SSR 85-15; SSR 96-8p). Defendant argues that Plaintiff misunderstands what is required when the ALJ formulates an RFC assessment based upon the mental RFC assessments conducted by the examining and treating physicians. (Docket No. 13 at 10-11). Defendant claims that the list of individual limitations in Section I of the mental RFC assessment is meant to act as a "worksheet" to help the examining and consulting physicians make an RFC determination. (Docket No. 13 at 10-11) (citing POMS DI 24510.060). Section III is the actual RFC assessment - a

argues that the ALJ provided substantial evidence to back his RFC assessment by citing to Plaintiff's credibly established limitations - particularly those found by Dr. Jonas and Dr. Crabtree. (Docket No. 13 at 8).

The ALJ justified his decision to deny benefits to Plaintiff in large part by minimizing the impact of the symptoms of Plaintiff's bipolar syndrome and depression. First, the ALJ stated that Plaintiff's purported inability to stay stimulated would be remedied by the structural routine provided by employment. (R. at 17). Second, he determined that because Plaintiff's affect, physical appearance, speech, thought organization, impulse control, and insight and judgment were often noted as unremarkable by Mr. Gigliotti, and because she once received a GAF of 64, Plaintiff only had mild impairment in her functioning. (R. at 17). Third, Plaintiff's often mild emotional lability at her therapy sessions with Dr. Mondoly and Mr. Gigliotti were determined by the ALJ to be a clear indication that she was not markedly limited in functioning. (R. at 17). Fourth, the ALJ found that Plaintiff's functionality was only mildly limited because her doctors managed to maintain her on a stable regimen of medications. (R. at 18).

As to the ALJ's assertion that employment would provide the structure necessary to stimulate Plaintiff, the ALJ provided no supporting evidence from the record - from any medical professionals,

---

narrative explanation of a claimant's limitations and capacities - and it allows an ALJ to determine what significance the individual limitations in Section I may or may not have. (*Id.*). Section III should encompass Section I, but need not explicitly include each limitation in Section I individually. (*Id.*). Accordingly, the Defendant argues that the ALJ need not include each limitation from Section I in his RFC assessment. (*Id.*).

Defendant makes the more persuasive argument with respect to this issue, not only because of the plain wording of POMS DI 25020.010(B)(1) ("it is the narrative written by the psychiatrist or psychologist in section III ('Functional Capacity Assessment') of form SSA-4734-F4-Sup that adjudicators are to use as the assessment of RFC"), but also in light of the holding in *Liggett v. Astrue* (2009 WL 189934 at 8 (E.D.Pa. 2009)), where the court found that the ALJ did not err when he did not include all the individual limitations from Section I in his RFC assessment based upon Section III of an evaluating doctor's mental RFC assessment. In the instant case, the Plaintiff's argument that the ALJ must explicitly include all the individual limitations from Section I of the examining and consulting physicians' RFC assessments into his own, fails. However, as discussed infra, the ALJ's decision is not supported by substantial evidence.

or otherwise - to support this conclusion. Plaintiff mentioned that a structured home life brought her emotional stability, but at no point did the ALJ provide evidence supporting his finding that employment would do the same. (R. at 55). Pure speculation may not be the basis for a benefits determination. *Morales*, 225 F.3d at 317 ("an ALJ may not make 'speculative inferences from medical reports'"). With respect to Dr. Mondoly and Mr. Gigliotti's treatment notes, which indicated Plaintiff was often "unremarkable," and once rated Plaintiff as having a GAF score of 64, the ALJ failed to explain why the Plaintiff's one-time high score of 64 was representative of Plaintiff's lengthy treatment history, which includes scores ranging from the low 50's to low 60's[28]. (R. at 261-79, 419-33). The ALJ also failed to note that Plaintiff was not "unremarkable" in all aspects, and in fact, numerous appointment notes - particularly after the date of Plaintiff's alleged disability - indicated the presence of psychological issues. (R. at 261-79, 419-33). Additionally, the ALJ failed to reconcile his reliance upon the therapy notes of Dr. Mondoly and Mr. Gigliotti, instead of their RFC assessments showing significant limitations in Plaintiff's ability to hold competitive employment. (R. at 419-22, 430-33). The Court of Appeals for the Third Circuit in *Brownawell* held that notes for purposes of treatment do not always translate into an accurate representation of a claimant's ability to hold competitive employment. *Brownawell*, 554 F.3d at 356 ("this Court has admonished ALJ's who have used such reasoning, noting the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work"). *See also Morales*, 225 F.3d at 319 (the work environment is completely different from home or a mental health clinic). Even though the notes of Plaintiff's treatment sessions, and the RFC assessments,

---

[28] Plaintiff was also once assessed a GAF score of 39 upon discharge from the UPMC Western Psychiatric Institute and Clinic in 2005. (R. at 252-53). The ALJ failed to acknowledge this score, as well, without providing any reasoning.

may have appeared contradictory, *Brownawell* and *Morales* counsel against simply disregarding the RFC assessments because the treatment notes vary. *Brownawell*, 554 F.3d at 356; *Morales*, 225 F.3d at 319. The ALJ's failure to discuss why he felt Dr. Mondoly and Mr. Gigliotti's treatment notes were more representative of Plaintiff's true condition rather than their RFC assessments, illustrates the lack of substantial evidence supporting the ALJ's conclusions. The same reasoning applies to treatment notes regarding Plaintiff's emotional lability and her maintenance on medications.

The ALJ also attempted to justify his denial of benefits by concluding that Plaintiff's difficulty with concentration was not as severe as Plaintiff would lead one to believe. (R. at 17). To explain his finding, the ALJ cited Plaintiff's time spent on her computer to check email, occasional movie watching, occasional card games with a friend, and one known trip by Plaintiff to a casino. (R. at 17, 388). However, the ALJ again failed to cite to Plaintiff's medical history as support, and further erred in failing to explain why Plaintiff's unspecified activities at a casino - or other above mentioned activities - illustrated that she had sufficient concentration and memory to hold employment, despite Dr. Mondoly and Mr. Gigliotti's reports stating otherwise. (R. at 420-21, 431-32); *Plummer*, 186 F.3d at 429 ("an ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence"). *See also Rocco*, 826 F.2d at 1350 (finding error where "[n]either the ALJ nor the Council set forth any basis for substituting their judgment for the reports of the medical experts"). The ALJ did not explain why he implicitly rejected Dr. Crabtree's determination that Plaintiff had significant cognitive difficulties that interfered with her ability to concentrate and remember things in order to get work done. (R. at 390). Specifically, Dr. Crabtree found that Plaintiff's concentration, persistence, and pace were "problematic." (R. at 390). Dr. Crabtree also stated that he had difficulty determining if Plaintiff had the capability to return to

work in light of her concentration and memory deficits. (R. at 390). The ALJ's conclusion that Plaintiff's concentration and memory were not limiting runs counter to the conclusions of medical professionals who personally treated Plaintiff, and without evidence to rebut their determinations, the ALJ failed to support his decision with substantial evidence. *See Plummer*, 186 F.3d at 420 ("treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time'"). The findings of examining and treating physicians cannot be summarily dismissed - the ALJ was required to provide support from the record adequate to counter these medical opinions, and he failed to do so.

In justifying his denial of benefits, the ALJ also concluded that Plaintiff's sleep abnormalities were not limiting. (R. at 17). According to the ALJ, Plaintiff's inability to sleep soundly was a result of her irregular sleep pattern during the day - there was no medical evidence that Plaintiff needed to sleep during the day - and Plaintiff would "in all probability" sleep well at night if she did not sleep during the day. (R. at 17). In dismissing the potential effects of Plaintiff's sleep abnormalities to justify his benefits determination, the ALJ failed to provide any supporting evidence from her medical history. The ALJ also erred when he made speculative conclusions about the Plaintiff's sleep patterns, while ignoring Dr. Mondoly and Mr. Gigliotti's statement that Plaintiff suffered from a severe sleep problem. (R. at 17, 434). Without some citation to the record to support the ALJ's statements, this Court is denied the ability to determine if findings were discredited properly, for the wrong reasons, or simply ignored. *Burnett*, 220 F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

Finally, certain of the ALJ's determinations appear to be supported by Dr. Crabtree's findings

28

that Plaintiff was only slightly limited in the ability to carry out simple repetitive activities, markedly limited in her ability to respond appropriately to work pressures, and only moderately limited in her ability to interact appropriately with the public or co-workers. (R. at 18). The ALJ also relied upon Dr. Jonas' finding that Plaintiff was able to carry out very short and simple instructions and to sustain an ordinary routine without special supervision. (R. at 18). The ALJ relied upon these findings despite Dr. Mondoly and Mr. Gigliotti's findings otherwise. (R. at 18). This leads the Court to discussion of Plaintiff's final two arguments.

### C. Treatment of the Opinions of Psychiatrist and Therapist

The ALJ rejected many of Dr. Mondoly and Mr. Gigliotti's RFC findings when he adopted contradictory findings by Dr. Jonas and Dr. Crabtree, despite extensive treatment history by the former. (R. at 17). The ALJ believed that because both Dr. Mondoly and Mr. Gigliotti failed to recognize that employment could have provided Plaintiff with the structure she needed; because both had treatment notes that appeared inconsistent with their respective RFC assessments; and, because both made findings that were influenced by Plaintiff's substance abuse, the findings of these medical professionals carried little weight. (R. at 17, 19). In her Motion, Plaintiff argues that the ALJ's disregard for Dr. Mondoly and Mr. Gigliotti's assessments was not supported by substantial evidence from the record. (Docket No. 9 at 15-17). Defendant argues that it is the job of the ALJ to weigh the credibility of the evidence and its sources, and that the ALJ may find a treating medical professional's opinion to have less weight if not well-supported by clinical findings and if inconsistent with other substantial evidence from the record. (Docket No. 13 at 12).

As mentioned earlier, the ALJ failed to provide adequate evidence from the record to justify his conclusion that employment would have provided Plaintiff with the structure she needed to

remedy certain of her limitations, and therefore, this conclusion cannot stand due to lack of substantial evidence to support it. *Morales*, 225 F.3d at 317. Also, as discussed above, inconsistency in treatment notes and RFC assessments do not necessarily discredit the RFC assessments, as the purpose of the treatment notes is different and they are applied within a different context. *Brownawell*, 554 F.3d at 356; *Morales*, 225 F.3d at 319. Without a more thorough explanation by the ALJ, this inconsistency is not enough to provide substantial evidence to discredit Dr. Mondoly and Mr. Gigliotti's RFC assessments.

With respect to Plaintiff's drug abuse, while the ALJ attempted to discredit Dr. Mondoly and Mr. Gigliotti's therapy notes and assessments because the ALJ believed they were unduly influenced by Plaintiff's drug abuse, he fails to even mention their frequent notations that Plaintiff was not abusing drugs and/ or was in remission, and notations indicating their acknowledgment of Plaintiff's relapses during treatment. (R. at 261-79, 419-33). Without support from the record to counter these statements, the ALJ's conclusion is not supported by substantial evidence[29]. The ALJ must consider all medical findings that support a treating physician's assessment that a claimant is disabled, hence the ALJ should not have summarily dismissed the opinions of Dr. Mondoly and Mr. Gigliotti without providing support from the record to justify his decision. *Morales*, 225 F.3d at 317-318 (the ALJ can only reject a treating physician's opinion on the basis of contradictory medical evidence, not on the ALJ's own credibility judgments, speculation or lay opinion).

---

[29]

It is also noted that Dr. Crabtree determined in his assessment of Plaintiff that she was in early recovery, and any existing drug or alcohol abuse did <u>not</u> contribute to her identified limitations. (R. at 395) (emphasis added).

### D. Failure to Incorporate Limitations Identified by Consultative Examiner

Lastly, the ALJ accorded the findings of Dr. Crabtree "substantial weight" when formulating the reasoning for denying Plaintiff DIB and SSI benefits. (R. at 18). Yet, Plaintiff argues that the ALJ failed to acknowledge the finding by Dr. Crabtree that Plaintiff had marked limitation in her ability to respond appropriately in a *usual* work setting - which would have directly affected his RFC assessment - in favor of the findings of a non-examining, consulting doctor - Dr. Jonas. (Docket No 9 at 14). Defendant contends that the ALJ is not required to adopt the entirety of Dr. Crabtree's findings, and moreover, that the ALJ accommodated the finding at issue in his RFC assessment and hypothetical question to the vocational expert stating that Plaintiff was to avoid work requiring a rapid production pace or similar sources of a high level of work-related stress. (Docket No. 13 at 11-12).

The ALJ failed to provide any reasons for disregarding the finding of this marked limitation by Dr. Crabtree. The ALJ should not have summarily adopted the inconsistent finding of a non-examining doctor over that of an examining doctor without some explanation. *Morales*, 225 F.3d at 320 ("It is well established that the opinions of a doctor who has never examined a patient 'have less probative force as a general matter, than they would have had if the doctor had treated or examined him'"). Thus, this finding cannot be credited in this Court's estimation.

## VI. CONCLUSION

Based upon the foregoing, the ALJ's decision is not supported by substantial evidence. Accordingly, Defendant's Motion for Summary Judgment is DENIED; Plaintiff's Motion for Summary Judgment is DENIED, to the extent it seeks to award benefits; and, GRANTED, to the extent it seeks a remand for further administrative proceedings. The case is therefore REMANDED for further consideration. An appropriate Order follows.

_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: July 7, 2010
cc/ecf: All counsel of record.